**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| **JANE DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | **TRIAL BY JURY DEMANDED** |
| **COMMONWEALTH OF VIRGINIA,** ) | |
| **VIRGINIA COMMUNITY COLLEGE** ) | |
| **SYSTEM, AND THOMAS NELSON** ) | |
| **COMMUNITY COLLEGE,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Jane Doe, by counsel, files this Complaint against Defendants, the Commonwealth of Virginia, Virginia Community College System, and Thomas Nelson Community College.  The Complaint arises from Defendants' acquiescence, condonation, exacerbation, and ratification of a racially-hostile and -discriminatory work environment created by a student against Plaintiff and, moreover, Defendants' discriminatory termination of Plaintiff's employment.  Plaintiff, thus, claims discrimination and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., and the Virginia Human Rights Act, Virginia Code §§ 2.2-3900, *et seq*. In support of this Complaint, she alleges as follows:

### PARTIES

1.     Plaintiff Jane Doe ("Doe") is an individual, natural person, and, at all times relevant, a citizen of Virginia residing in Norfolk, Virginia.

2.     Defendant Commonwealth of Virginia ("Commonwealth") is a person, a government, and the sovereign power of Virginia.

3.      Defendant Virginia Community College System ("VCCS") is a state agency of the Commonwealth and administers, controls, governs, and operates the Commonwealth's community colleges and educational institutions throughout Virginia.

4.      Defendant, Thomas Nelson Community College ("TNCC") is a state community college and education institution administered, controlled, governed, and operated by VCCS. TNCC's main campus, administration, officers, and employees are located in Hampton, Virginia.

5.      For ease of reference in this Complaint, Plaintiff references the Commonwealth, VCCS, and TNCC collectively as TNCC.

## JURISDICTION AND VENUE

6.      This Court possesses original jurisdiction over the Complaint, pursuant to 28 U.S.C. §§ 1331 and 1343, because the Complaint presents federal questions under Title VII of the Civil Rights Act of 1964, as codified under 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

7.      This Court possesses supplemental jurisdiction over the Complaint, pursuant to 28 U.S.C. § 1367, because the Complaint presents a claim under the Virginia Human Rights Act, Virginia Code § 2.2-3900, *et seq*. ("VHRA"), that is so related to the federal Title VII questions that they form the same case and controversy.

8.      This Court, namely the Newport News Division of the Eastern District of Virginia, is the proper venue for Doe's Complaint, pursuant to 28 U.S.C. § 1391, because TNCC is located in Hampton, Virginia and the events below occurred at that location.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On July 27, 2021, Doe filed an administrative complaint with the Office of the Virginia Attorney General's Office of Civil Rights ("OCR"), in compliance with the exhaustion requirements of the VHRA.  Doe's administrative complaint alleged discrimination, a hostile work

environment, and retaliation, in violation of the VHRA and Title VII.

10.    On August 27, 2021, OCR transferred Doe's administrative complaint to the United States Equal Employment Opportunity Commission ("EEOC") and took no further action, investigative or otherwise, on the administrative complaint.

11.    On October 25, 2021, at the EEOC's request, Doe supplemented the transferred administrative complaint from OCR with a timely Charge of Discrimination ("Charge").  In the Charge, Doe alleged discrimination, a hostile work environment, and retaliation, in continuing violation of the VHRA and Title VII.

12.    On February 16, 2022, the EEOC issued Doe a right-to-sue letter.

13.    On March 1 and 7, 2022, Doe requested a right-to-sue letter from OCR, in compliance with the exhaustion requirements of the VHRA.  On March 17, 2022, OCR refused to issue the letter, claiming that sovereign immunity precluded its investigation of the administrative complaint and issuance of the letter.

14.    Accordingly, Doe has exhausted all of the administrative requirements under Title VII and the VHRA.  Therefore, she now timely files this Complaint within ninety (90) days of her right-to-sue letter from the EEOC.

## STATEMENT OF FACTS

15.    Doe, who is Caucasian, commenced her employment with TNCC in the fall of 2014 as an adjunct history instructor.  Between August 2014 and May 2018, she taught between one and three courses most semesters, including courses online.

16.    In August of 2018, Doe accepted a full-time teaching position at TNCC.  Since then, she had repeatedly been reappointed to serve as a full-time history instructor.  At the conclusion of each academic year, Doe also taught a summer course or otherwise assisted TNCC

with academic projects, per her adjunct responsibilities.

17.     During her employment with TNCC, Doe has consistently received positive performance evaluations.  She also earned a teacher of the year award for the 2019-2020 year.

18.     Doe has also never been the subject of disciplinary action at TNCC.

19.     In addition to her success as an instructor, Doe's career at TNCC has included other positive contributions.  For example, Doe was the founding member of TNCC's Social Justice and Societal Change Committee.  The purpose of this committee is to address issues of systemic racism and injustice which affected the TNCC community for students, faculty, and staff as well as provide opportunities to have conversations about instituting internal changes on TNCC's campus.

20.     Additionally, in January of 2021, Doe spearheaded the National Day of Racial Healing event at TNCC and Poetry and Prose for Healing writing contest centered on social justice. These events were spearheaded in order to promote racial justice.

21.     In the spring 2021 semester, Doe was teaching her usual course load of six courses at TNCC.  One of those courses was HIS 112-D01, which was an asynchronous (100% virtual) World Civilization course.  As a component of the course, students were required to converse on historical topics by posting submissions to an online discussion board.

22.     Student A was a TNCC student and, in the spring of 2021, enrolled in Doe's HIS 112-D01 course.  She identified as Black and Pacific-Islander.

23.     On January 26, 2021, Student A posted a conversation topic to the course discussion board, summarizing a recent book she had read.  In her posting, she exceeded the course's word-count requirement for her post.

24.     Being the instructor, Doe contacted Student A about the post and reminded her of the word-count.  Doe did so to help Student A receive full credit in the course.

25.     Nonetheless, Student A continued to post in non-compliance with the word-count.

26.     Other students, who were not persons of color, also submitted posts to the discussion board in non-compliance with the word-count requirement.  As she had done with Student A, Doe also reminded these other students of the word-count requirement.

27.     Student A soon posted a public message on the discussion board to another student of color on February 12, 2022.  The message was visible to course participants, including Doe.

28.     In the message, Student A stated, "[i]t looks like you may have gotten the same comments I did about length.  I'd like to encourage you and say that, if this is the case, you are among friends."  She continued, "I think that since this particular discussion required so much in terms of detail, it is difficult to keep word count down, but I think you did a fantastic job."  Student A added, "[i]t is difficult to put great effort into these discussions under such circumstances, but again I encourage you to try to keep your same level of greatness."  In fact, Doe had not made any comments to this other student about word-count, despite Student A's assumption.

29.     On February 15, 2022, Doe contacted Student A about her post and, in part, explained the basis for the word-count requirement.  Perceiving that Student A seemed upset by the requirement, she explained, "I create a word limit as concise writing often elevates content."  Doe continued, "[b]y establishing limits, I am asking students to select the most critical/pertinent information and focus on that."

30.     Student A responded:

The action is discouraging to students who care about what they put forth as a graded product.  Where you may see concise speech, others may see restriction.  I think that your discussion boards lack the consistency to make a length requirement.  Some of your discussions are multi-faceted, others are not.  In the past couple of weeks, I've seen the words, 'about 250 words' or 'about 2-3 sentences' or nothing at all.  Why threaten students for writing too much if you won't make a reasonable start and end to the length.  It's as simple as saying, 'In 200-300 word, or 400-500 words . . . .'  If word count isn't worth describing in detail and it's not in your rubric

then it really should be discussed in our comments.  Either way, I hope [the other student] doesn't shut down and let this effect [sic] his grade.  I know I won't.

31.     Subsequently, Doe requested a meeting with Student A to discuss the matter further.

32.     Doe also hoped that, in meeting with Student A, she could repair a strain she perceived in the relationship, reiterating that she wanted Student A to succeed in her course.  Doe was also following TNCC policy by requesting the meeting.

33.     Student A refused to meet with Doe.  Instead, she responded, in part:

No ma'am.  I will not meet with you.  Simply because you perceive something as an issue, it does not mean it is the case.  I have been more than professional in both my discussions and comments.  However, your responses here show me a form of fragility and sensitivity that I, as a black woman, cannot pretend will not create more problems than solutions.

Student A's response otherwise to Doe was aggressive toward and dismissive of Doe.

34.     On February 17, 2022, Doe responded and reiterated the course requirements and concluded, "[a]s your instructor, I ask that you maintain professionalism on the discussion board so that the class maintains a positive learning environment.  If you have issues with me as an instructor those can be addressed in a private setting."

35.     On February 18, 2022, Student A responded, stating "[y]ou have no right whatsoever to sensor [sic] what I write in this class.  Nor do you have any right to tell me what I intend, think, or feel.  It seems you were hurt by my words."  She added, "[t]he truth is this, I have no problem telling you there's something wrong with your class and there is."

36.     Student A then inserted race into the conversation, stating, "[b]ased on your repeated ad hominem attacks, I believe that there is more to your comments.  It seems that my work ethic and continued respect that I've shown you has been completely ignored because I'm black."

37.     Student A's accusation without any basis in fact that Doe, who was merely trying to do her job and administer the course, was acting with racial motivation was troubling to Doe.

38.     Indeed, Doe had not even met Student A in person and, apart from Student A's communications in which she self-identified as Black and Pacific Islander, did not even know Student A's background or race.  In contrast, Student A was aware that Doe was Caucasian, due to recorded video-lectures Doe had posted in the course.

39.     After the conversations above, Doe contacted TNCC's History Department Chair, Stacey Schneider, and requested assistance with the situation.  Doe was concerned that, in addition to Student A's private communications against her personally, Student A would disrupt the course through her postings to the discussion board.  Schneider directed Doe to let the situation settle down and took no further action.

40.     Doe also contacted TNCC Dean Ursula Bock, who was Doe's other supervisor.  Doe explained the situation and asked Bock for assistance.  She informed Bock of Student A's insertion of race into the conversation and insinuation that Doe was treating Student A differently because of her race, as opposed to her refusal to follow course requirements.  Like Schneider, Bock directed Doe to let things settle down, rather than directly handle the situation.  She told Doe that directly handling the situation may further enflame it.  Like Schneider, Bock took no other action.

41.     Left to handle the situation on her own, Doe did as she was directed.  She took no further action for several weeks in an attempt to let the situation settle down.

42.     After a few weeks, or on March 3, 2022, Doe contacted Student A and simply re-conveyed that her doors were open to communicate if Student A so desired.

43.     The next day, Doe graded one of Student A's assignments.  Student A received an A (95%), which was one of the highest grades in the course.

44.     Nonetheless, on March 5, 2022, Student A contacted Doe, insulting her further and inserting race for the third time into her conversation:

> You have yet to apologize for your flippant assumptions about my character.  In your hubris, you've made so many mistakes in this course and did nothing to right them.  You keep offering me a conversation that I don't want because you think what you did was okay.  I think it was racially motivated and you blew me off.  How then, could I talk to you?  You don't consider me an equal.  You haven't paid any attention to anything I've said.

45.     Doe had made no assumptions about Student A's character, flippant or otherwise. And Student A's own "*ad hominem*" attacks against Doe and insinuations that Doe was, in short, a racist, had no basis in fact or reality.

46.     Student A continued thereafter to insult Doe as a professor and the course, without basis, even once inappropriately commenting, "I am afraid that you may teach one of my kids."

47.     Student A's hostility toward Doe was unwelcome.  Moreover, given her baseless insinuations that Doe was acting with racial-motivation, Student A demonstrated that it was she, not Doe, who was racially-motivated.  In other words, Student A was harassing and insulting Doe simply because Doe is Caucasian.  This hostility was not only upsetting to Doe, but also intimidating.

48.     On March 5, 2022, Doe and Bock spoke, again, about the situation with Student A. She informed Bock of the significant emotional distress she had been experiencing as a result. Doe broke down and cried during this conversation.

49.     Doe inquired about removing Student A from her course or taking other corrective action so that she was not subjected to these continuous insults.  Bock did not take any such action, merely stated she would "look into" the matter, and directed Doe to handle the situation herself.

50.     Upon information and belief, Bock and Schneider informed TNCC President Towuanna Porter Brannon of Doe's situation with Student A.  In her capacity as TNCC's

President, Brannon is the decision-maker for all matters, including employment.  Despite Brannon being aware of the situation, nothing was corrected.

51.     In short, TNCC was aware of Doe's situation and the unwelcome and racially-motivated treatment Doe was experiencing.  Yet, by its inaction and indifference, TNCC acquiesced and ratified Student A's behavior and directed Doe to tolerate it, thereby discriminating against Doe as well.

52.     On March 5, 2022, Doe contacted Student A, stating, "I've shared your concerns with my supervisor who will be looking into the matter.  As next week is spring break, please provide time for your concerns to be addressed.  Thank you for your patience."

53.     Student A responded immediately:

I am your student.  I have an A in your class.  If you do not want to address my concerns, why would your supervisor?  I read the Student and faculty codes.  You can do whatever you want.  I have an A.  Nobody cares.  This was my last attempt to reach out to you.  Not your supervisor.  If it was a matter of ignorance, it can be fixed.  If it's pride, you cannot be helped.  Who knows which one it is.  Maybe you're just offended . . . .  Do whatever you need to do.

54.     Between March 5 and 15, 2022, Student A continued to insult Doe, including nitpicking her for what Student A perceived as Doe's deficiencies and failures in the course.

55.     Doe did not engage Student A in a similar manner.  Following spring break, she contacted Student A, with Bock's knowledge, in an attempt to resolve the situation and work toward a positive remainder of the semester.

56.     Doe's effort was unsuccessful.  Through the remainder of March of 2022, Student A continued to make inappropriate, insulting, and racially-motivated comments against Doe.

57.     Doe informed TNCC, through her supervisor Bock, of the continued harassment.  Bock responded by telling Doe that "ignoring" Student A was "the prudent approach."

58.     Doe followed this instruction.  The result was evident - for more than six weeks,

Student A's behaviors against Doe continued unabated and escalated with TNCC's full awareness.

59.     Receiving no assistance from TNCC, Doe attempted to resolve the situation by "ignoring" it as TNCC had directed while at the same time attempting to do her job as an instructor. As part of her job, she engaged her students, including Student A, in intellectual and professional dialogue relating to their discussion board submissions.  Student A responded only with hostility.

60.     For example, on March 28, 2022, Student A remarked to Doe's attempts, stating, "[y]our comment on my discussion is yet another reason why I called out your racism and carelessness."  Student A's statement had no basis in fact or reality.

61.     Around this time, Doe was notified to contact TNCC's Director of Human Resources, Dr. Lynda Byrd-Poller.  Byrd-Poller is a closely-associated part of Brannon's cabinet. She notified Doe that TNCC did not plan to reappoint her after the semester.  In other words, Doe's full-time teaching employment with TNCC was to terminate at the end of the semester.

62.     Doe was completely caught off-guard.  First, she had taught at TNCC since 2014 and had an impeccable career.  Second, earlier in the semester, TNCC, through its Vice President of Academic Affairs, Susan English, had indicated that Doe would be teaching during the coming academic year.  In fact, Doe had met with English to discuss a course reduction for the 2021-2022 year so that she could work on other TNCC community relations projects and public programs.

63.     TNCC took this adverse employment action against Doe because of the situation with Student A and simultaneous to Doe's complaints of the same.

64.     Further, TNCC was distancing itself from Doe because Student A had recently threatened TNCC with legal action for race discrimination.  TNCC intended to avoid that which it anticipated was to be the negative optics and publicity of supporting a Caucasian instructor in a dispute with a student of color that included a racial issue.

65.     In so doing, TNCC, again, acquiesced and ratified Student A's conduct toward Doe, further contributed to and exacerbated Doe's increasingly hostile work environment, and intentionally discriminated against Doe because of her race.

66.     In fact, Doe learned that Student A had met with Brannon prior to the adverse action above, made a complaint against Doe for racism, and threatened TNCC with legal action.

67.     In addition to meeting with Brannon, Student A met with Schneider.  Schneider informed Doe that Student A had asked prying questions about Doe personally and professionally, discussed Doe's daughter's handicap (which Doe had never brought up in the course), and advised her of the complaint to Brannon against Doe.

68.     Thus, Student A was not only calling Doe a racist in their direct conversations but was also privately investigating Plaintiff's personal life and falsely proclaiming that she was a racist to her supervisors and employer.  In fact, Student A had even requested to speak about Doe at the upcoming TNCC board meeting which is open for public comments.

69.     Learning of Student A's baseless complaint, Doe contacted Brannon and requested a copy of it.  Brannon did not provide it to Doe.  In this way, TNCC deprived Doe of an opportunity to defend herself, including her character, morality, professionalism, and good reputation.

70.     During this time, Doe further learned that Brannon believed Student A was trying to build a legal case against TNCC for discrimination.  Upon information and belief, Brannon made the decision to distance TNCC from Doe, which included terminating Doe.

71.     The situation with Student A and TNCC's inaction over the same caused Doe significant physical and emotional anxiety and stress.  Doe was not sleeping.  She developed bruxism, requiring medical attention.  The situation also caused strain in her personal relationships. Doe also started counseling.  And TNCC was aware of the impact the situation was having on her.

72.     On April 2, 2021, Doe, again, complained to TNCC about Student A's conduct. She also asked Byrd-Poller that Student A be removed from her course.  This request was ignored.

73.     On April 15, 2021, TNCC informed Doe and Student A at the same time that Schneider was to grade Student A's assignments in the course moving forward.  Student A, however, would remain in Doe's course.  This decision, despite Student A's behavior and even violation of TNCC policies, emboldened Student A.  Student A again proceeded to make false allegations against Doe on the course discussion board.

74.     Given this new instance of harassment and because TNCC had done nothing in response to Doe's previous complaint, on April 15, 2021, Doe complained a second time about Student A's harassment to TNCC's administrators.

75.     At or around the same time, TNCC informed Doe that, in addition to her not being reappointed as a full-time teacher in the coming academic year, no other non-teaching employment position would be available to her in the coming year.  This was despite assurances that Doe had recently received from English to the contrary.

76.     TNCC's actions and inactions caused Student A's conduct toward Doe to worsen.

77.     On April 17, 2021, Student A posted an openly disruptive and insulting comment on the course discussion board, titled, "An Act of Protest."  The post was about Doe and directed to all students in her course.  In the post, Student A falsely and defamatorily stated, *inter alia*:

(a)     "I have been racially profiled by this professor";

(b)     "Any attempts to discuss grades, correct mistakes made on tests, or respond in email have been met with racist micro-aggressions, racial micro-invalidations, and micro insults";

(c)      "During discussion boards, the professor had insinuated that Hawaiian people (which is part of my ancestry) were not brown-skinned individuals and inaccurately used a PEW article to support her racist remarks";

(d)      "The reason discussion boards were all of sudden required to be 'grounded in course material' was because she wanted an excuse to give me a less than perfect score";

(e)      "My work is now graded by another professor";

(f)      "[O]ur inaction in the face of white supremacy, homophobia, micro-aggressions, antisemitism, racism, abuse of power, etc. can cause a ripple effect that allows a student to be treated worse next semester";

(g)      "I'm here for history. That's all. You have something to teach, teach it and treat me like everyone else.  Respond to me like you respond to everyone else.  Respect me like you respect everyone else.  Be, Do, Teach.  It's simple.  Unless you have an ulterior motive."

78.      In accordance with TNCC policies, and Student A's violations of the same, Doe removed Student A's discriminatory, disruptive, and false post from the discussion board.

79.      Doe submitted Student A's post to Brannon, Bock, and Schneider.  TNCC agreed that Doe's action to remove the post was appropriate but then took no action to help Plaintiff or end Student A's harassment, including but not limited to removing Student A from the course.

80.      Around this same time, Doe also learned that Student A had privately communicated with Doe's other students about Doe.

81.      In fact, one of Doe's other students contacted Doe and let her know about the communication, stating that he disagreed with what the "disgruntled" Student A was saying.  He further stated, "I have not witnessed any of what the student says to have experienced in the class. I just wanted to let you know what was going on, just in case others started to attack you."  Doe

asked TNCC for a copy of Student A's private communication to the other students and that TNCC enforce their Technology Use Policy against bullying and harassment, but TNCC ignored her.

82.     Doe contacted Byrd-Poller and explained how the situation was affecting her emotionally.  Byrd-Poller notified Brannon. Again, no corrective action occurred.

83.     Doe also informed TNCC that Student A had threatened to post about her on Twitter, and it was becoming increasing clear that Student A was intent on disrupting not just Doe's course — but also her career and life.

84.     Subsequently, Brannon also informed Doe that Student A planned to make a public comment about Doe at TNCC's next board meeting (which was open to the public).

85.     During a subsequent meeting with Brannon's cabinet and administrators, Doe broke down in tears because of the immense strain of being repeatedly verbally assaulted by Student A and falsely and publicly called, *inter alia*, a racist, white supremacist, antisemite, and homophobe.  Furthermore, she was distraught by Student A's continued escalation of such conduct and decision to bring it to the TNCC board and beyond.

86.     Byrd-Poller attended this meeting.  Doe was informed that TNCC had prepared a statement should Student A take her false allegations of racism public, as she was threatening to do.  TNCC's statement was concise and wholly unsupportive of Doe, conveying only that TNCC intended to hire an outside investigator to review the situation.

87.     During this meeting, a member of Brannon's cabinet told Doe that TNCC could not support her in any meaningful way.

88.     Furthermore, when Doe directly stated that Student A was racially harassing and defaming her, one administrator agreed that Student A's actions likely were illegal, but said that TNCC would not address them.  Instead, Doe was advised to speak with a private lawyer.

14

89.     Ultimately, and only because Doe continued to persist with TNCC, TNCC convened a student conduct hearing on the matter.  The proceeding was chaired by the Dean of Student Services and heard by three TNCC staff members, all of whom were persons of color and not TNCC faculty.

90.     Throughout the proceeding, it became evident to Doe the proceeding was a sham. Doe was subjected to intense scrutiny and treated unprofessionally.  The panel also did not let her present evidence to support her position.  In contrast, the panel was supportive of Student A and dismissive of the harassment Doe had experienced.

91.     In the course of the proceeding, Student A contacted Doe and threatened that she would "suffer" the "consequences" for complaining.  Upon information and belief, Student A continued to communicate with others at TNCC, including faculty and students, and spread her racially-motivated lies about Doe.

92.     In early May of 2021, the panel above decided to exonerate Student A for any misconduct, including disrupting Doe's course and, as Doe had complained, harassing Doe.  Doe had no recourse from this decision.

93.     On or about May 7, 2021, Brannon met with Doe via Zoom.  Doe inquired about the outside investigation into the situation.  Brannon informed Doe the investigator was to interview her.  Doe, again, asked for a copy of Student A's complaint to prepare for the interview, but she was not provided it.  Doe also asked if she could have an advisor present.  Brannon refused.

94.     Given TNCC's course of conduct, Doe became concerned that TNCC was investigating the matter not to exonerate Doe but to build its own defense.  That defense, as her meeting with TNCC's cabinet revealed, likely involved scapegoating Doe on the basis of race and due to Student A's continued hostility and intimidation.

95.     Following her exoneration, Student A was further emboldened and continued her behaviors toward Doe.  She sent another message to Doe, calling Doe a "racist" and an "oppressor" and threatening to "press charges" against Doe.  She attacked Doe's "Irish" heritage, even though Doe is not Irish and had never indicated she was of Irish descent, falsely stating, "you pushed an Irish only narrative, supporting your own heritage . . . and ignoring people of color."  Student A's message, which was racially-motivated, contained other falsities and insults about Doe, her course, and her character, morality, and professionalism.

96.     Student A copied Brannon, Bock, and Schneider on this message.

97.     Student A also demanded in her message that any future communication with her must include Brannon, who is Black.  In so demanding, she claimed TNCC's Caucasian faculty was a "good ole girls club."

98.     That same day, Doe met with Bock.  They spoke about the semester, Doe's struggles with Student A, and, again, the lack of support Doe had received from TNCC.  Doe complained about her frustration that so little had been done to correct her situation and that Student A had been left in her class—thus allowing her to continue her harassment.

99.     Bock informed Doe during this meeting that the only way to have Doe removed from the situation would have been for Doe herself to resign from TNCC.  She then notified Doe that, contrary to past practice, Doe would not be assisting with any other academic projects in the summer, thus terminating Doe's adjunct role.  Bock informed Doe that Doe's last day of employment was May 15, 2021.

100.     As with her termination, this adverse action against Doe only served to acquiesce and ratify Student A's continuing behavior and exacerbate Doe's hostile work environment.  Moreover, through its inaction, adverse employment actions, and biased exoneration of Student

16

A, TNCC was clearly treating Student A more favorably than Doe and, thus, discriminating further against Doe because of race. On the whole, Student A had also been permitted to harass, insult, and intimidate Doe without repercussions or discipline despite violating TNCC policies.

101.    Following the complete termination of her employment at TNCC, Doe participated in the off-boarding process. In the process, TNCC requested Doe submit a resignation letter. Doe refused to do so because she had not resigned.

102.    Further, during Doe's exit interview, TNCC's Human Resources representative, Natalie Keeling asked Doe if she had experienced harassment or discrimination at TNCC. Keeling was aware of Doe's situation with Student A and the question seemed odd to Doe for an exit interview. When Doe answered the question affirmatively, Keeling dismissed her and responded "Well if that's how you feel...." This response illustrated TNCC's treatment of Doe.

103.    Following Doe's last day of employment with TNCC, TNCC's outside investigator contacted Doe. Doe responded, indicating her willingness to interview. Given how the situation had transpired, however, she requested to have an advisor present. Brannon, through the investigator, denied the request. Doe, again, requested a copy of Student A's complaint and the opportunity to submit a written defense statement in lieu of an interview. Both requests were denied. Upon information and belief, the investigation exonerated Doe of wrongdoing but that exoneration was never made publicly known.

104.    In the fall of 2021, TNCC offered the same courses Doe had taught prior to the situation with Student A and Doe's subsequent termination. Despite her experience, qualifications, and performance, TNCC did not offer Doe any opportunity to teach these courses.

105.    TNCC treated Doe in the above manner because of her race. TNCC's poor handling of the situation from the outset ratified and inflamed a hostile situation. Student A was provided

a voice for her false allegations and supported by TNCC, particularly Brannon.  On the contrary, Doe was harassed with impunity and lost her job, source of income, professional trajectory, and the years of service she had given to TNCC.

106.    Doe is not a racist, white supremacist, antisemite, or homophobe.  Yet, TNCC's conduct and treatment of Doe lent public credibility to Student A's false narratives to the contrary, damaging Doe significantly as a personal and professional matter.

## COUNT I
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.
### (Discrimination)

107.    Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 106, *supra*.

108.    Title VII directs, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (alteration and emphasis added).

109.    Pursuant to the requirements of Title VII, an employer owes an employee a duty to maintain an employment environment that is free from race discrimination.

110.    Moreover, an employer may be liable not only for its own failure to maintain such an environment but also for its acquiescence and ratification of a third party's discriminatory conduct.  An employer may be liable if it knew or should have known of the conduct and failed to take appropriate and prompt remedial actions to end it.

111.    TNCC is an employer under Title VII.  At all times relevant, TNCC acted through its highest-level agents, employees, officials, and supervisors, *supra*, including Brannon.

112.    At all times, Doe was an employee of TNCC and is protected under Title VII.

113.    At all times relevant, Student A was a TNCC student and a third party who was subject to TNCC's control and supervision.

114.    Notwithstanding, for the reasons set forth, *supra*, TNCC violated its duty under Title VII by acquiescing and ratifying the racially-discriminatory and -harassing conduct of Student A against Doe and by discriminating against Doe through its various actions and inactions.

115.    At all times relevant, TNCC knew and should have known of the extent to which Student A was bullying, discriminating against, and harassing Doe, but it failed to take any appropriate and prompt remedial action to end Student A's actions against Doe.  Indeed, TNCC repeatedly directed Doe to "ignore" it.  TNCC's actions and inactions, including the adverse employment actions above, occurred because of Doe's race and demonstrated animus toward her.

116.    At all times relevant, the above-referenced TNCC employees were acting in the course and scope of their employment with TNCC; therefore, TNCC is liable for their actions under the doctrine of *respondeat superior*.  Their actions and inactions, which demonstrate animus toward Doe, were committed during work hours, at their place of employment, and were in conjunction with work-related duties.

117.    As a direct and proximate cause of those actions and inactions, Doe has suffered and will continue to suffer pecuniary loss, including lost back and front pay, emotional and physical pain, embarrassment, humiliation, mental anguish, reputational damage, shame, loss of enjoyment of life, and other non-pecuniary losses.

118.    Any reasons TNCC cites for its actions and inactions, *supra*, of Doe are pretextual. In fact, at all times, Doe was satisfactorily performing her teaching position, had done so for eight years, and met or exceeded all of TNCC's legitimate expectations.

119.    The above-described actions and inactions, including the adverse employment actions above, by TNCC constitute discrimination in violation of Title VII.

120.    Doe is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT II**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.**
**(Hostile Work Environment)**

121.    Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 120, *supra*.

122.    At all times, TNCC had an obligation under Title VII to maintain a work environment that was not charged with race discrimination and hostile to Doe.

123.    Notwithstanding, for the reasons set forth, *supra*, TNCC violated its duty under Title VII by acquiescing and ratifying the racially-discriminatory and -harassing conduct of Student A against Doe and by discriminating against Doe through its various actions and inactions.

124.    TNCC violated Title VII, moreover, by permitting a discriminatory, hostile, and offensive work environment to exist and escalate for months, ending in Doe's termination, including at the hand of third-party Student A.

125.    The above-referenced TNCC employees were acting in the course and scope of their employment with TNCC at the time of their actions and inactions; therefore, TNCC is liable for their actions under the doctrine of *respondeat superior*. Their actions and inaction against Doe, which demonstrate animus, were committed during work hours, at their place of employment, and/or were in conjunction with work-related responsibilities.

126.    Doe was subjected to unwelcome conduct by Student A.

127.    Student A's unwelcome conduct (and TNCC's ineffectual response) against Doe

20

was because of Doe's race.

128.    Student A's conduct against Doe was so severe and pervasive that it altered the conditions of Doe's employment and created an abusive and hostile work environment for her.

129.    Doe made numerous complaints to TNCC about Student A's conduct but those complaints were either dismissed, brushed aside, or disregarded, and, ultimately, nothing appropriate or prompt was done to end it.  In fact, although TNCC was aware of the situation, TNCC's biased and poor handling of the situation and actions and inaction only aggravated the environment and emboldened Student A's actions against Doe.  Thus, those actions and TNCC's response are imputable to TNCC itself.

130.    As a direct and proximate cause of the same, Doe has suffered and will continue to suffer pecuniary loss, including lost back and front pay, emotional and physical pain, embarrassment, humiliation, mental anguish, reputational damage, shame, loss of enjoyment of life, and other non-pecuniary losses.

131.    Any reasons TNCC cites for its actions and inactions, *supra*, are pretextual.  In fact, at all times, Doe was satisfactorily performing her teaching position, had done so for eight years, and met or exceeded all of TNCC's legitimate expectations.

132.    The above-described actions and inactions by TNCC constitute a hostile work environment,  in violation of Title VII.

133.    Doe is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

### COUNT III
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.
### (Retaliation)

134.    Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through

133, *supra*.

135.    Title VII's anti-retaliation provision provides, in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

136.    From February 2022 to May of 2022, Doe repeatedly complained to TNCC of discrimination and harassment, concerning Student A's conduct, *supra*, and TNCC's ineffective response.  In so doing, Doe not only opposed conduct in violation of Title VII but participated in proceedings concerning it.

137.    TNCC, through its agents, employees, and officers identified above, were aware of Doe's situation and complaints concerning the same.

138.    Shortly after and thereafter simultaneously with those complaints, TNCC subjected Doe to the series of adverse employment actions above, which included but are not limited to, (a) terminating her teaching position with TNCC, (b) terminating Doe's summer services and adjunct role, (c) reneging on reassurances to Doe would have employment at TNCC in the fall of 2021, and (d) failing to offer Plaintiff the opportunity to teach the very same courses she had taught in the past during the fall of 2021 or even spring of 2022, even though they were available.

139.    TNCC would not have taken these adverse employment actions against Doe but for Doe's protected opposition and participation activities alleged above.

140.    Any reasons TNCC cites for adverse employment actions against Doe are pretextual.  In fact, at all times, Doe was satisfactorily performing her teaching position, had done so for eight years, and met or exceeded all of TNCC's legitimate expectations.

141.    TNCC's discriminatory and retaliatory conduct has prejudiced Doe significantly, as she has lost compensation and benefits, sustained other monetary losses, and suffered the loss of an eight-year-long stellar career as a teacher for TNCC as a direct result of TNCC's violation of Title VII's anti-retaliation provision.

142.    As a direct and proximate cause of TNCC's conduct, Doe has suffered and will continue to suffer pecuniary loss, including lost back and front pay, emotional and physical pain, embarrassment, humiliation, mental anguish, reputational damage, shame, loss of enjoyment of life, and other non-pecuniary losses.

143.    Doe is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT IV**
**Virginia Human Rights Act, Virginia Code § 2.2-3900, *et seq.***
**(Discrimination, Hostile Work Environment, and Retaliation)**

144.    Doe incorporates and re-asserts fully herein the allegations of paragraphs 1 through 143, *supra*.

145.    Virginia Code §§ 2.2-3900, *et seq*., namely the "Virginia Human Rights Act" ("VHRA"), provides, "[i]t shall be the policy of the Commonwealth" to "[s]afeguard all individuals within the Commonwealth from unlawful discrimination in employment because of race . . . ." Va. Code § 2.2-3900.B.2.

146.    In this context, the VHRA provides that "[i]t shall be an unlawful discriminatory practice" for "[a]n employer to . . . discharge, or otherwise discriminate against any individual with respect to such individual's terms conditions, or privileges of employment because of such individual's race . . . ." Va. Code § 2.2-3905.B.1.

147.    When an individual has suffered a violation of the VHRA, the VHRA provides her

a private right of action, stating, "[a]n aggrieved person . . . may commence a . . . civil action . . . over the person who allegedly unlawfully discriminated against such person in violation of this chapter." Va. Code § 2.2-3908 (alterations and emphases added).

148.    As used above, a "person" is defined as, "consistent with §1-230 of the Virginia Code, any individual, . . . government, . . . or any other . . . representative, agent, agency, or instrumentality thereof." 1VAC45-20-20 ("Regulations Regarding the Virginia Human Rights Act," and "Definitions"); *see also* Va. Code § 1-230 (defining a "person" the same way).

149.    Finally, the VHRA provides, "[c]onduct that violates any . . . federal statute . . . governing discrimination on the basis of race . . . is an unlawful discriminatory practice under this chapter." Va. Code § 2.2-3902.

150.    Doe is an individual and person under the VHRA.

151.    TNCC is a person under the VHRA and, thus, subject to this claim by Doe. That is, the Commonwealth is a "government," VCCS is an "agency" of the Commonwealth, and TNCC is an agency and instrumentality of the Commonwealth and VCCS.

152.    Therefore, the violations of Title VII that Doe has alleged above also violate the VHRA. Accordingly, Doe incorporates herein by reference the allegations in ¶¶ 107-43, which establish violations of Title VII, to establish violations of the VHRA.

153.    As a direct and proximate cause of TNCC's violation of the VHRA, Doe has suffered and will continue to suffer pecuniary loss, including lost back and front pay, emotional and physical pain, embarrassment, humiliation, mental anguish, reputational damage, shame, loss of enjoyment of life, and other non-pecuniary losses.

154.    At all times relevant, TNCC engaged in discriminatory and retaliatory conduct with malice or reckless indifference to Doe's protected rights under the VHRA, so as to support an

award of punitive damages.  Va. Code § 2.2-3908.B.  TNCC even acknowledged the illegality of Student A's conduct toward Doe; yet it did nothing appropriate and prompt to end it.

155.    Doe should be entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to Virginia Code § 2.2-3908.B.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Jane Doe requests the following relief against Defendant Thomas Nelson Community College: (a) compensatory damages; (b) punitive damages (on Count IV only); (c) back pay; (d) front pay; (e) equitable and injunctive relief; (f) attorney's fees and costs; and (g) any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Jane Doe demands a trial by jury on all issues so triable and reserves the right to amend this Complaint to add new claims and parties as discovery may warrant.

**Respectfully Submitted,**
**JANE DOE**

_____/s/_____
Nicholas Simopoulos, Esquire
VSB No. 68664
Simopoulos Law, PLLC
11 South 12th Street
Richmond, Virginia 23219
(804) 220-5755
nicholas@simopouloslaw.com
*Counsel for Plaintiff, Jane Doe*